Filed 5/13/26  P. v. Delvillar CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANGEL DELVILLAR,<br><br>    Defendant and Appellant. | F087310<br><br>(Super. Ct. No. 1432625)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Shawn D. Bessey, Judge.

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Hannah Janigian Chavez, Deputy Attorneys General, Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

In 2013, appellant Angel Delvillar was convicted by jury of the first degree murder of Julio Jimenez (Pen. Code,[1] § 187, subd. (a), count 1), robbery of an inhabited dwelling (§ 212.5, subd. (a), count 2), and robbery (§ 211, count 3).  As to counts 2 and 3, the jury also found true gang enhancements under section 186.22, subdivision (b)(1), and gun use enhancements under section 12022.53, subdivisions (d) and (e)(1).[2]

Following prolonged appellate proceedings on direct appeal, where Delvillar's judgment of convictions on count's one, two and three were affirmed, Delvillar's case was remanded back to the lower court so that it may exercise its discretion to strike the vicarious gun use enhancements.  At the resentencing hearing, trial counsel also argued that the gang enhancements must be stricken following the enactment of Assembly Bill No. 333 (2021– 2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1–5) (Assembly Bill 333).  The trial court left the gang enhancements intact but imposed enhancements for the personal use of a firearm (§ 12022.53, subd. (b)), in lieu of the vicarious liability enhancements found true by the jury under subdivisions (d) and (e)(1) of section 12022.53.  Delvillar was resentenced to an indeterminate term of 25 years (15 and 10) to life in state prison, plus a determinate term of 18 years, four months.

Delvillar raises the following arguments on appeal:  First, the personal use of a firearm enhancements must be vacated because there was no jury finding that Delvillar had personally used a firearm during the offense.  Second, the gang enhancements applied to his sentence must be vacated based on the heightened evidentiary requirements effected by Assembly Bill 333.

---

[1]    All further undefined statutory citations are to the Penal Code unless otherwise indicated.

[2]    Delvillar was tried with codefendants Hector Joaquin Rocha, Jr., Phillip Lopez, Jr., and Jaime Cerpa.  Although convicted, they are not parties to the instant appeal.

We agree that the section 12022.53 subdivision (b) gun-use enhancements must be vacated. As the Attorney General concedes, the facts supporting these enhancements were found true by the court at Delvillar's evidentiary hearing on his then-pending section 1172.6 petition for resentencing, rather than by a jury at trial. However, we find Delvillar's claim that Assembly Bill 333 necessitates reversal of the gang enhancements meritless. Based on the foregoing, we remand the matter back to the lower court for further proceedings consistent with this opinion, including reinstatement of the vicarious firearm enhancements originally found true by the jury, and for the trial to exercise its discretion to strike those enhancements.

## FACTUAL AND PROCEDURAL HISTORY

On September 21, 2011, a Stanislaus County Grand Jury returned an indictment charging Delvillar and four codefendants with murder (§ 187, subd. (a); count 1), robbery of an inhabited dwelling (§ 212.5, subd. (a); count 2), and robbery (§ 211; count 3). As to count 1, the indictment alleged that the murder was committed during the commission of a robbery and that all defendants were principals. As to counts 2 and 3, it was further alleged that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that all defendants were principals who violated section 186.22, subdivision (b), with at least one principal personally and intentionally discharging a firearm and proximately causing death (§§ 12022.7, 12022.53, subds. (d), (e)(1)).

On February 8, 2013, a jury found Delvillar guilty as charged. The court sentenced Delvillar to an indeterminate term of 25 years to life on count 1, plus consecutive determinate terms of four years on count 2 and one year on count 3. The court also imposed two consecutive terms of 25 years to life for the section 12022.53, subdivisions (d) and (e)(1) firearm enhancements on counts 2 and 3. The section 186.22, subdivision (b)(1) enhancement on counts 2 and 3 were stayed.

On May 3, 2018, this court affirmed the judgment of conviction but remanded the matter back to the lower court with directions, in relevant part, for the court to consider

3.

whether to exercise its discretion to strike the firearm enhancements pursuant to section 12022.53, subdivision (h). (See §§ 12022.53, subd. (h), 1385; *People v. Delvillar* (May 3, 2018, No. F069224) [nonpub.opn.])

On March 13, 2019, Delvillar filed a motion to strike or dismiss the section 12022.53, subdivisions (d) and (e)(1) firearm enhancements. The prosecution filed an opposition and Delvillar filed a supplemental brief in support of his motion.

On August 14, 2023, Delvillar filed another motion to strike or dismiss the firearm enhancements, citing amendments effected by Assembly Bill 333. The prosecution filed a supplemental opposition.

On December 8, 2023, the trial court held a resentencing hearing and modified the section 12022.53, subdivisions (d) and (e)(1) firearm enhancements on counts 2 and 3 to impose enhancements under section 12022.53, subdivision (b). The sentence on the gun use enhancement applied to count 2 was reduced to 10 years, and the sentence on the enhancement applied to count 3 was reduced to three years four months. The section 186.22, subdivision (b) enhancements on counts 2 and 3 remained stayed.

A timely notice of appeal followed.

### The Underlying Conviction

A.    The Prosecution's Case

1. Accomplice Testimony

On March 24, 2010, Delvillar, along with eight or 10 others, carried out a planned home invasion, during which, one of the victims was shot and killed. Three accomplices testified pursuant to agreements with the prosecution: Aquiles Virgen, Daniel Flores, and Domingo Becerra. In exchange for their truthful testimony, Virgen was offered a sentence of 15 years to life, Flores a sentence of six years, and Becerra a sentence of 25 years to life. Their testimony is summarized as follows:

### a. Aquiles Virgen

On March 23, 2010, Johnny "Manos" Montalvo organized a meeting at a residence in Keyes to plan a home invasion robbery. At Montalvo's direction, Virgen brough fellow gang members Phillip Lopez and Santos Cardenas with him.

Virgen and Montalvo were both Norteño gang members, and of the roughly eight to 10 men present during the planning discussions, Virgen identified many of them as members of or affiliated with the same gang, including: Hector Rocha, Delvillar, Daniel Flores, Domingo Becerra, Santos Cardenas, and a man known to Virgen only as "Snoop."[3]

Montalvo instructed the group, including Delvillar, to go into the target house, take any drugs inside, and return to the Keyes residence with the proceeds. Virgen testified that participants were not promised individual payment and that any proceeds from the home invasion would go to incarcerated members of the gang. The meeting lasted approximately 15 minutes.

With the assistance of Montalvo and Becerra, who brought in five guns, members of the group armed themselves before departing. Delvillar carried a single-shot shotgun; Virgen had a .357 revolver that was provided by Domingo and Montalvo; Flores possessed a nine-millimeter pistol; Rocha carried another .357; and Becerra had either a .32- or .38- caliber revolver. Virgen did not see Lopez with a firearm. Virgen loaded his firearm.

Rocha drove one of the two groups to the target residence—a home on Thrasher Avenue in Modesto, in his Jeep. Becerra sat in the front passenger's seat, while Virgen sat in the backseat between Delvillar and Daniel Flores. Lopez rode in the cargo area. A red car driven by Santos Cardenas followed behind to divert police attention, if necessary. On the way, Rocha stopped at a gas station to fill up his Jeep. The red vehicle followed.

---

[3] Later identified as John Rivera

Delvillar's group reached the Thrasher Avenue residence shortly after midnight on March 24th. They saw an SUV was unexpectedly parked in the driveway. The men covered their faces with makeshift masks.

After circling the block once, the group decided to proceed with the planned home invasion. Rocha parked his Jeep, and all six men inside ran to the SUV and pulled two men and a woman from the inside. During the ensuing confrontation, Virgen lost sight of the red decoy vehicle.

Unable to access or breach the front door of the residence, the men moved the victims into the backyard where they placed them on their hands and knees. Virgen held the victims at gunpoint.

Two or three of the men entered the house through broken windows in the back of the house, while Lopez remained out front as a lookout.

Virgen and one other member of the group remained in the backyard. He heard shouting from inside the house, a struggle, and then a gunshot. Two more gunshots followed, as well as the sound of police sirens. Virgen, and all five of his accomplices in the red Jeep, ran back to the Jeep and drove away. The men discarded their masks and all but one of the firearms out of the window.

Within five minutes, Rocha's Jeep was spotted by a police cruiser. A pursuit ensued, during which more than 10 police vehicles followed Rocha's Jeep. The Jeep stopped after running over a spike strip. The group got out of the vehicle and fled in different directions.

Virgen was detained 20 to 30 minutes later while hiding in someone's backyard. When he was transported back to the police department, Virgen noticed that Delvillar had not been detained. When he spoke to detectives about the home invasion, he did not mention Delvillar's involvement.

At some point after his arrest, Virgen saw Delvillar in jail. Delvillar told him that when the group fled on foot, he hid inside of a laundry room until the police left the area.

### b. Daniel Flores

Flores, a self-admitted gang member, was first introduced to the Norteño gang at 14 years old. According to Flores, the Keyes residence was a Norteño gang hub occupied by Cerpa, who went by the gang moniker of Joker.

On March 23, 2010, Montalvo instructed Flores, who was then 15 years old, to come to house in Keyes. Montalvo told Flores to bring his nine-millimeter Taurus pistol, while Flores's brother, Juan, carried a single-barreled sawed-off shotgun.[4] Flores stated that his gun was loaded.

Rocha, Zachary Spinella, Sergio Gutierrez, Juan, and Flores arrived at the Keyes residence together in a Jeep driven by Rocha. Flores identified all occupants in the Jeep as "Norteños" or "Northerners," explaining that the former denotes an earned rank within the gang.

When the group arrived, there were about 12 to 15 people present, including Delvillar. Flores put his nine-millimeter on the kitchen table to load it. He observed a .38 revolver and a .357 revolver lying on the table as well.

Montalvo informed the group that they were going to commit a home invasion at a residence in Modesto to steal money and crystal methamphetamine. After the home invasion, the group would return with the proceeds to the Keyes residence. According to Flores, John "Snoop" Rivera ordered the group not to shoot or hurt anybody unless they posed a threat to their lives. He added, "If anything, wound them, don't kill them."

Approximately 15 minutes later, Rocha departed from the Keyes residence in his Jeep, with Becerra in the front passenger's seat, Delvillar in the rear compartment, and Virgen, Flores, and Lopez in the back. A red car with Montalvo, Rivera, and one other individual followed.

---

[4] We refer to Flores's brother Juan by his first name throughout the remainder of this opinion because they share the same last name. No disrespect is intended.

A green SUV was parked in front of the Thrasher Avenue residence. The group forced its three occupants out, attempted to enter the residence using one of the victim's keys, and when they could not, took the victims into the backyard. Flores took the female victim's purse and kicked and hit one of the victims.

Three of the perpetrators entered through the back door by kicking the door down. Flores, who remained outside, heard yelling from inside the house. Then, a gunshot rang out from inside the home, followed by one or two more.

As Flores looked inside the home, one of the victims in the backyard attempted to flee by climbing over the fence. Flores pulled him down by his shirt and warned that "if he moves again, [he was] going to shoot him." At that time, Lopez was positioned at the front of the house, and the remaining men—Delvillar, Rocha, Virgen, and Becerra—were inside. Within a minute, Becerra ran out of the house. The victim who had tried to jump the fence, later identified as Jimenez, said something in Spanish, and as he was lying flat on the ground with his hands over his head, Becerra shot him in the back.

Just before the shooting, Flores heard sirens in the distance. He announced, "[W]e got to go," and yelled for the group to get back into the Jeep. All six men got back into the Jeep and took off. Flores saw the red decoy vehicle as they fled the Thrasher residence, but lost sight of it after that.

The men discarded their face masks. Becerra gathered all but one of the guns and began throwing them out of the window. Flores stashed his nine-millimeter handgun underneath his seat.

The group drove to the Parklawn area of Modesto before the Jeep was completely disabled. After fleeing on foot, Flores was quickly detained by police.

### c. Domingo Becerra

Becerra, a longtime Norteño who was also a police informant, testified that Jaime Cerpa, known as "Joker", summoned him to the Keyes residence on March 23, 2010.

8.

Becerra identified Cerpa as a "big homie," meaning he had authority over younger members of the gang.

Becerra brought his .357-caliber handgun with him, which he kept concealed in his waistband. Becerra dropped off his mother's red Toyota and got a ride to Cerpa's house (the Keyes residence) with two acquaintances. It was still daylight when he arrived.

After Cerpa arrived, the group discussed committing a home invasion. Becerra suggested the target residence, which was a known drug house. While he was there, Montalvo and Joe Ramirez arrived. Montalvo arrived with a firearm concealed underneath his shirt.

At some point while he was at the Keyes residence, Delvillar left and drove Becerra and Montalvo to pick up Snoop Rivera in Modesto. When they returned, Becerra hid his gun under the sofa.

The second time Becerra departed from the Keyes residence, Delvillar drove Becerra, Rivera and Montalvo to pick up Becerra's "homie," Johnny, to confront him about talking badly about the regiment. When they returned to the Keyes house, all the remaining participants in the home invasion had arrived. The group ripped up clothing to use as makeshift masks and Becerra distributed firearms to the participants.

Becerra had already retrieved his firearm from the couch cushion. He loaded it with ammunition provided by Montalvo. Two or three of the men ripped up clothing to use as masks. They wore multiple layers of clothing so that they would be more difficult to identify.

Rocha drove the red Jeep with Becerra, Flores, Lopez, and Virgen, while Rivera drove Delvillar, Cardenas, Montalvo, and another unidentified male in Becerra's mother's red Toyota, which they had retrieved earlier. Becerra testified that everyone that participated in the home invasion was gang affiliated, and that everyone inside of the Jeep was armed.

The plan was for the group to enter the target residence through a back gate. However, once they arrived, they noticed a garbage dumpster blocking the alleyway. The group contemplated whether to proceed with the home invasion. Becerra told Rocha to drive around to the front.

As they reached the front of the house, a green SUV pulled up. Believing the SUV belonged to the homeowners, Becerra's group removed its occupants and tried to use the driver's keys to access the front door. When that was unsuccessful, they forced the victims to the backyard at gunpoint. Becerra testified that the ensuing events transpired rapidly.

Becerra claimed that he did not see Delvillar at the property because Delvillar was walking around the block as a lookout for law enforcement. He stated that his accomplices in the red Toyota parked two houses away.

Becerra hit one of the victims in the SUV with the barrel of his gun and told him to "Get the fuck down." Virgen and Flores hit another victim with their guns.

Unable to access or break down the front door of the residence, Becerra instructed Virgen to start breaking windows to help Rocha get inside. When Virgen, Rocha, and Becerra accessed the home, Becerra began looking for drugs in a room separated from the main house.[5]

Becerra heard Flores, who was outside, state that one of the victims was getting up. Becerra went into the backyard and observed Jimenez trying to jump over the fence. Then, he heard gunshots erupt from inside the house.

As Jimenez was crawling and pleading, Becerra shot him three times in the back. Simultaneously, Becerra heard police sirens in the distance. After the group fled in Rocha's Jeep, Becerra collected the guns and masks and discarded them out of the window.

---

[5]    Responding officers subsequently explained that there was a studio-style apartment in the backyard. It was described as a sealed-off room with a door and no windows.

Becerra did not mention Delvillar's participation in the crime until grand jury proceedings, and at trial, he claimed that Delvillar was not among the group that fled in Rocha's Jeep.

### 2. The Victims' Testimony

#### a. Isaias Pantoja

Pantoja lived with his two-year-old daughter at the Thrasher Avenue residence. He testified that he cleaned homes for a living and he neither sold nor possessed drugs. He had begun renting the Thrasher Avenue residence only three weeks earlier.

According to Pantoja, on the night of the home invasion, he and his daughter were asleep in the living room when he was awoken by shouting. When he peered out of the window, he saw five or six individuals wearing blue and black clothing and carrying weapons. They had handkerchiefs covering their faces.

Pantoja observed two people being led and one being dragged to the backyard. One of the men was being hit. As Pantoja was on the phone with 911, he heard multiple windows being broken.

Three men entered Pantoja's home and took his cellular phone from him. One of the assailants demanded Pantoja's money and then hit him with the butt of his pistol. They took approximately $110 from his wallet.

Pantoja heard one gunshot from inside the residence, and one from outside. The men fled once they heard police sirens. Pantoja estimated that they were in his home for approximately four or five minutes.

#### b. Corina Vargas

Vargas testified that she and her friend, "Tino," went to the Thrasher residence to buy methamphetamine.[6] While walking there, Vargas and Tino caught a ride with an acquaintance, a man driving a green SUV that Vargas knew only as Jose (Jimenez).

---

[6] Fortino "Tino" Soto, could not be located at the time of trial.

When they arrived, Vargas saw eight to 10 persons wearing black and coverings over their faces surround the SUV. According to Vargas, all the assailants were armed with firearms. Two of the men came into the SUV and demanded that Vargas and her companions get out of the vehicle.

The men took her purse and told Vargas to " 'Shut the fuck up or [they would] kill her.' " During the encounter, Vargas heard someone shout the word, "Norte."

Two of the assailants forced Vargas into the backyard and made her lie on the ground. Vargas then heard two or three gunshots coming from inside of the home, yelling, and infant crying, and the sound of windows breaking. She heard police sirens approaching.

One of the assailants came into the backyard and told Jimenez to get on the ground. As he pled for his life, Jimenez was shot four or five times in a quick succession. Vargas stayed on the ground as the perpetrators fled over the fence. Eventually, when she saw no one else around, she got up and ran home. The following day, a detective came to her home and returned her purse and identification card.

Vargas did not identify or otherwise describe any of her assailants. She stated that they sounded "really young."

### 3. Law Enforcement Investigation/Non-Accomplice Evidence

At approximately 12:42 a.m., officers responded to a report of shots fired at the Thrasher Avenue residence. They found Jimenez deceased in the backyard with gunshot wounds. They also found broken windows, a broken fence, blood spatter throughout the inside of the residence, blood droplets outside of the home, and two bullet strike marks—one in the kitchen ceiling and the other in the mudroom.

Following a police pursuit, officers apprehended Becerra, Flores, Rocha, Virgen, and Lopez in the Parklawn area. At 1:24 a.m., law enforcement stopped a red Toyota driven by Rivera and occupied by Montalvo and Cardenas. However, because law enforcement had no information tying the Toyota or its occupants to an active crime, Rivera and his companions were released.

After Becerra was apprehended, he directed law enforcement to the locations where he had discarded the guns and masks. Along the route, police found a single-barrel 12-guage shotgun, broken into three pieces, with a live round; pieces of red cloth; two loaded .357 revolvers; a loaded .38 Smith & Wesson special revolver; live shotgun rounds; a black cotton glove; a piece of a white t-shirt; and a black latex glove. A chrome-finished .357 revolver Becerra described was never recovered.

The day after the incident, officers found a red Toyota at Becerra's mother's home. Delvillar's wallet was located inside the glove box.

E.O., who lived in the Parklawn area, later found her laundry shack disturbed and a shirt that was not hers inside. E.O. brought the black and gray Pendelton shirt to the police station. A police report written by Detective Craig Grogan, a detective with the Modesto Police Department, indicated that the Pendleton shirt likely belonged to an unknown suspect.

At the grand jury proceedings on September 19 and 20, 2011, Becerra and Flores had already entered into plea agreements with the prosecutor in exchange for their truthful testimony. Only then did Becerra and Flores implicate Delvillar in the home invasion robbery.

Delvillar was not arrested until September 17, 2011, when he was taken into custody for an unrelated homicide. He was remanded into custody for the instant offense on September 27, 2011.

### 4. *The Gang Evidence*

The prosecutor theorized that the home invasion was committed for the benefit of the Stanislaus-area Norteño criminal street gang. Detective Sean Martin with the Modesto Police Department testified as a gang expert for the prosecutor. Based on his training and personal experience, Detective Martin described the structure and practices of the Norteños, the hierarchy of the gang, how members identify their affiliation with the gang, and the use of younger members for criminal activities.

13.

### B.    *The Defense's Case*

#### 1.  *Hector Rocha*

Rocha testified that Montalvo ordered him to drive his Jeep and that Delvillar gave him money for gas.  He claimed that Delvillar entered the house with him, that he (Rocha) fired two shots into the ceiling, and that Delvillar took Pantoja to another room, after which Pantoja returned bleeding.  Rocha heard three shots outside in rapid succession, causing him and Delvillar to flee through the back door.  According to Rocha, he did not see anybody lying on the ground as they fled through the backyard because it was dark.

#### 2.  *Delvillar*

Delvillar presented no separate trial defense evidence.

## DISCUSSION

### I.    THE PERSONAL FIREARM USE ENHANCEMENTS MUST BE STRICKEN AND THE VICARIOUS FIREARM ENHANCEMENTS REINSTATED

Delvillar contends, and the Attorney General concedes, that the personal firearm-use enhancements imposed by the trial court in lieu of the vicarious enhancements under subdivisions (d) and (e)(1), must be stricken.  The Attorney General further argues that the vicarious enhancement must be reimposed, and the matter should be remanded back to the trial court so that it may exercise its discretion to strike those enhancements.

We accept the parties' concession and agree with the Attorney General's proposed solution.  We will strike the personal use enhancements, reimpose the vicarious firearm enhancements under section 12022.53, subdivision (d) and (e)(1), and remand the matter back to the lower court so that it may exercise its discretion to strike those enhancements.

### A.  *Background*

In 2013, following trial, the jury found true gang enhancements on counts 2 and 3 and found that a principal personally and intentionally discharged a firearm causing death.  The trial court imposed consecutive 25-year-to-life terms for the section 12022.53, subdivisions (d) and (e)(1), enhancements.

In 2018, this Court remanded the matter for the trial court to consider whether to strike or dismiss the firearm enhancements under section 12022.53, subdivision (h). (See *People v. Angel Delvillar et al.* (F069224, May 3, 2018) [nonpub. opn.].) Following remand, Delvillar moved to strike the enhancements pursuant to sections 1385 and 12022.53, subdivision (h). In response, the prosecutor filed an opposition, arguing dismissal was not in the interests of justice because Delvillar had used a firearm to strike Pantoja during the home invasion.

In August 2023, Delvillar filed a motion to dismiss the firearm enhancements based on Assembly Bill 333, arguing the enhancements were predicated on gang findings no longer supported under current law. The prosecutor opposed the motion.

In December 2023, the trial court conducted a hearing on the vicarious firearm enhancements and the gang enhancements applied to Delvillar's sentence. Delvillar argued he was a minor participant in the home invasion, and that the gang and firearm enhancements could not be sustained under amended law absent valid jury findings. The prosecutor responded that the evidence continued to support the gang findings and that the court could impose a lesser firearm enhancement under section 12022.53, subdivision (b), pursuant to *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*).

After reviewing the trial record and the section 1172.6 evidentiary hearing, the court concluded the crimes were committed for the benefit of a gang and that a jury would still reach true findings under current law. The court further found the evidence supported imposition of enhancements under section 12022.53, subdivision (b), and modified the section 12022.53, subdivisions (d) and (e)(1), enhancements on counts 2 and 3 accordingly. The enhancement terms were reduced, and the section 186.22 enhancements remained stayed.

B.     *Analysis*

In *Tirado*, our Supreme Court held that a trial court has discretion to strike a section 12022.53, subdivision (d), firearm enhancement and impose a lesser uncharged

15.

enhancement under subdivisions (b) or (c). (*Tirado, supra,* 12 Cal.5th at p. 697.) The court explained that a trial court is not categorically prohibited from imposing an uncharged, lesser-included enhancement when the prosecution has alleged the greater enhancement and the facts supporting the lesser enhancement have been alleged and found true. (*Id.* at pp. 697–698, 702.)

Here, although the prosecutor presented evidence that Delvillar was armed with a firearm during the commission of the home invasion and that he struck Pantoja with that firearm, that evidence was contested. Moreover, the jury was not required to make a finding on whether Delvillar was in fact armed. The jury's findings under section 12022.53, subdivisions (d) and (e)(1) reflect findings that a *principal* was armed with a firearm. As the prosecutor explained during closing argument, the firearm enhancement applied to all of the defendants based on the fact that Becerra had fatally shot Jimenez during the home invasion.

We recognize that, following a section 1172.6 evidentiary hearing, the trial court found that Delvillar was armed with a firearm and that he used the weapon to strike the victim.[7] As the parties concede, however, the trial court's finding in a collateral proceeding was not sufficient to support imposition of the enhancement. *People v. Arellano* (2024) 16 Cal.5th 457 (*Arellano*) is instructive.

In *Arellano*, our Supreme Court held that a trial court resentencing a petitioner under section 1172.6 lacked authority to impose a firearm enhancement that had never been admitted or found true by a trier of fact. (*Arellano, supra,* 16 Cal.5th at p. 464.) The enhancement had been dismissed as part of a negotiated disposition, and the trial court relied on police reports and other hearsay summaries to conclude that the defendant was armed. (*Id*. at pp. 464–465.) The court rejected this approach and explained that

---

[7] The ruling on the trial court's denial of Delvillar's petition for resentencing is currently pending before this court in case No. F085963.

resentencing under section 1172.6 is limited to the target offense or underlying felony. Section 1172.6 does not authorize the trial court to add enhancements based on postconviction judicial factfinding or statements within the record of conviction. (*Arellano,* at p. 470.)

A similar defect occurred here. The jury never found that Delvillar personally used a firearm. Instead, the jury returned true findings only under section 12022.53, subdivisions (d) and (e)(1), which required proof that a principal discharged a firearm during a gang-related offense, causing great bodily injury or death. As in *Arellano*, the trial court later relied on its own factual findings from a collateral proceeding to conclude that Delvillar personally used a firearm during the offense. Under section 1172.6, however, a court may not impose enhancements or allegations that were not previously admitted or found true. (*Arellano, supra,* 16 Cal.5th at p. 477 ["Courts may not impose uncharged and unproven sentence allegations or enhancements when resentencing a successful petitioner under section 1172.6, subdivision (e)"].)

We conclude that the trial court exceeded that authority when it modified the jury's vicarious discharge findings and imposed personal use enhancements under section 12022.53, subdivision (b). Because the trial court lacked authority to impose the section 12022.53, subdivision (b), enhancements, those enhancements must be stricken. The jury's true findings under section 12022.53, subdivisions (d) and (e)(1), shall be reinstated. The matter is remanded for resentencing, during which the court shall exercise its discretion under section 1385 and *Tirado* to determine whether to strike or dismiss the lawfully adjudicated enhancements.

II.      ASSEMBLY BILL 333 RETROACTIVE EFFECT AND THE OMITTED ELEMENTS IN THE JURY INSTRUCTIONS

In 2013, when Delvillar was tried, the jury was instructed with CALCRIM No. 1401 [Felony Committed for Benefit of a Criminal Street Gang (Pen. Code, § 186.22, subd. (b)(1))] and CALCRIM No. 1402 [Gang-Related Firearm Enhancement (Pen. Code, §

12022.53)]. Effective January 1, 2022, Assembly Bill 333 amended section 186.22 and added new substantive elements and procedural requirements for proving gang enhancements and the substantive offense of active gang participation. (See *People v. E.H.* (2022) 75 Cal.App.5th 467, 477.) These changes apply retroactively to all convictions that were not yet final when Assembly Bill 333 took effect, including Delvillar's judgment. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1206.)

Delvillar contends that because the jury was instructed under the pre-Assembly Bill 333 version of section 186.22, the gang enhancements must be stricken. The Attorney General agrees that Assembly Bill 333 applies retroactively, but argues that striking the enhancements is unnecessary because any instructional error was harmless beyond a reasonable doubt.

We conclude the instructional error here, which resulted from intervening legislation, was harmless beyond a reasonable doubt. The record contains substantial evidence of other crimes committed by Norteño gang members acting at the direction of higher-ranking members, and that those offenses conferred a benefit to the gang that was more than reputational. (See § 186.22, subd. (e)(1).)

*A. Background: Evidence Establishing the Existence of the Gang*

To establish the existence of the Norteño criminal street gang, the prosecutor presented testimony from Detective Sean Martin of the Modesto Police Department, who testified as the prosecution's gang expert. Detective Martin had training and experience involving criminal street gangs in Stanislaus County, including the Norteños. He was also one of the primary investigating officers assigned to the currently charged offense.

Detective Martin opined that, as of the date of the charged offenses, there were approximately 5,000 active Norteños in Modesto. He explained that the Norteños were organized into a hierarchical structure, with the Nuestra Familia prison-arm at the top, followed by Norteños members on the street, and then Northerners at the bottom.

According to Detective Martin, Norteño members identify with the color red and the number 14, which represents the 14th letter of the alphabet, N. Members gain status by "putting in work" for the gang, which includes selling drugs to raise proceeds for the gang.

Detective Martin opined that one of the primary activities of the Modesto-area Norteños are the commission of robberies. He explained that proceeds from criminal activity, including drug sales and robberies, are used to purchase firearms and to place money on the books of incarcerated Nuestra Familia members.

To prove a pattern of criminal gang activity under section 186.22, the prosecutor relied on two offenses committed by Norteño gang members in Stanislaus County and introduced certified records of conviction.

First, an armed robbery committed by Virgen on January 20, 2009. Virgen admitted committing the offense and testified that he became a Norteño gang member at age 14 or 15. Virgen testified that the robbery was committed for personal benefit and claimed his accomplices were friends who were not gang affiliated. Virgen did admit however that the gang expects proceeds from robberies to be remitted to them, and that proceeds would go to incarcerated gang members.

Second, Sergio Gutierrez, Juan Flores, and Zachary Spinella committed an armed robbery at Lee Jong's Market in Modesto on March 19, 2010. Gutierrez, Flores, and Spinella were all active Norteño gang members who committed the robbery at the direction of higher-ranking gang members.

The prosecutor also told the jury, consistent with the instructions given at the time of trial, that the currently charged home invasion could serve as a predicate offense.

In addition to these predicate offenses, the record reflected evidence of other robberies committed by Norteño gang members. On March 8, 2010, Flores testified that he and his brother Juan robbed a taco truck in Delhi. They wore black hooded sweatshirts during the robbery, similar to the sweatshirt Flores wore during the charged home invasion. Rocha testified that had also he participated in the robbery at Montalvo's direction, that he

drove Flores and Juan to the robbery, and that Montalvo supplied the firearm used in the offense. After the robbery, the group returned to the Keyes house with approximately $400 in proceeds.

On March 12, 2010, Flores, Spinella, and Sergio Gutierrez committed an armed robbery of Nino's Market in Turlock. Flores testified that he committed the robbery at the direction of Ramirez and Montalvo. Montalvo instructed the group to return the proceeds, approximately $1,400, to the Keyes house, although Flores testified that he kept $100 for himself.

## B. Assembly Bill 333

" 'AB 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a "criminal street gang" to require that any gang be an "ongoing, organized association or group of three or more persons." (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members "individually or collectively engage in" a pattern of criminal activity in order to constitute a "criminal street gang," Assembly Bill 333 requires that any such pattern have been "collectively engage[d] in" by members of the gang. (§ 186.22, subd. (f).) Third, Assembly Bill 333 also narrowed the definition of a "pattern of criminal activity" by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang "members," as opposed to just "persons"; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any "common benefit" be "more than reputational." (§ 186.22, subd. (g).)' " (*People v. Lopez* (2025) 17 Cal.5th 388, 395–396; see *People v. Tran*, *supra*, 13 Cal.5th at pp. 1206–1207.)

"Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

C.    *Delvillar's Due Process Claim*

Delvillar contends that his right to due process was violated because he was not informed at his 2013 trial of the elements added by Assembly Bill 333, which became effective on January 1, 2022.  (See Stats. 2021, ch. 699.)  The Attorney General contends that Delvillar's argument is forfeited and meritless.  Forfeiture aside, we agree with the Attorney General that Delvillar's argument fails on the merits.

"Due process requires that 'an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial.' [Citation.] A defendant therefore cannot be prosecuted for an offense not shown by the evidence at the preliminary hearing or not arising out of the transaction upon which the commitment was based. [Citations.] Phrased somewhat differently, the rule is, '[a]n information which charges the commission of an offense not named in the commitment order will not be upheld unless (1) the evidence before the magistrate shows that such offense was committed [citation], and (2) that the offense "arose out of the transaction which was the basis for the commitment" on a related offense.' " (*People v. Calhoun* (2019) 38 Cal.App.5th 275, 303.)

The prosecutor here could not have anticipated Assembly Bill 333's changes, which became effective in 2022, at the time of Delvillar's trial in 2010.  It would be unreasonable to require notice of statutory amendments to section 186.22 that were not enacted until nearly nine years after his trial.

Delvillar relies upon *In re Vaquera* (2024) 15 Cal.5th 706 (*Vaquera*) to support his assertion to the contrary.  *Vaquera* however is readily distinguishable.  In *Vaquera*, our Supreme Court invalided a 25-year-to-life sentence where defendant was not given

21.

sufficient notice of the circumstances supporting a longer term under the One Strike law. (*Id*. at pp. 714–715, 724–725, 728.)

The *Vaquera* court reasoned, "[a] defendant has a due process right to fair notice of any sentencing allegation that, if proven, will increase the punishment for a crime. [Citations.]  In the sentencing enhancement context, the touchstone of fair notice is whether the accusatory pleading enables the defense to predict the sentence the defendant faces if convicted.  To enable a defendant to make this prediction, an accusatory pleading must provide the defendant with fair notice of the factual basis on which the prosecution is seeking an increased punishment and of 'the potential sentence.'  [Citation.]  [¶] When the prosecution has not alleged a particular sentencing enhancement in connection with a specific count, a 'defendant is ordinarily entitled to assume the prosecution made a discretionary choice not to pursue the enhancement ... and to rely on that choice in making decisions such as whether to plead guilty or proceed to trial.' "  (*Vaquera, supra,* 15 Cal.5th at p. 717.)

In contrast to *Vaquera*, Delvillar had fair notice of the criminal street gang enhancements alleged against him.  (*People v. Nash* (2023) 87 Cal.App.5th 483, 492 ["Due process requires that a defendant be given 'fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes' "].)  At the time of his trial, the prosecution pleaded and proved the gang enhancements under the then-existing version of section 186.22, and Delvillar had a full opportunity to contest those allegations.  The Legislature's subsequent decision to modify the elements required to establish a gang enhancement under section 186.22, did not retroactively deprive him of notice or otherwise undermine the fundamental fairness of his trial.  Because the enhancements here were properly alleged and proven under the law in effect during Delvillar's trial, we conclude that the subsequent alteration of the elements necessary to prove a gang enhancement did not contravene his due process rights.

D. *Effect of Omitted Elements*

    *1. Harmless Error Standard for Omitted Elements in Jury Instructions*

The parties agree that the jury was instructed under the pre–Assembly Bill 333 version of section 186.22 and that, as a result, the instructions omitted elements now required under the amended statute. The question before us is whether those omissions were harmless beyond a reasonable doubt.

When jury instructions omit elements that apply retroactively, a defendant is entitled to remand for further proceedings unless the error "is harmless beyond a reasonable doubt." (See *People v. Clark* (2024) 15 Cal.5th 743, 763.) The parties agree that prejudice resulting from such an instructional omission is reviewed under *Chapman v. California* (1967) 386 U.S. 18, 24. (See *Neder v. United States* (1999) 527 U.S. 1, 4, 17; accord, *Tran, supra*, 13 Cal.5th at p. 1207 [when a substantive change alters the elements of an offense and the jury is not instructed accordingly, the omission implicates the Sixth Amendment right to a jury trial, and reversal is required unless it appears beyond a reasonable doubt the verdict would have been the same absent the error].)

"In this assessment, we 'conduct a thorough examination of the record. If, at the end of that examination, [we] cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding — [we] should not find the error harmless.' [Citation.] Conversely, where we conclude 'beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.' " (*People v. Lamb* (2024) 16 Cal.5th 400, 449 (*Lamb*).)

" 'In assessing prejudice in this context, the question is not whether there is evidence in the record that would support a jury finding of the missing element. Instead, we ask whether we can conclude beyond a reasonable doubt that " 'the jury verdict would have

23.

been the same' " had the jury been instructed on the missing element.' [Citation.] 'Our task, then, is to determine "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." ' " (*Lamb, supra,* 16 Cal.5th at p. 449; *People v. Schuller* (2023) 15 Cal.5th 237, 261 [reversal is required "unless the reviewing court is persuaded that ' " ' "[n]o reasonable jury' " ' would have found in favor of the defendant on the missing fact, given the jury's actual verdict and the state of the evidence' "].)  To that end, " 'our task in analyzing the prejudice from the instructional error is whether any rational fact finder could have come to the opposite conclusion[.]' " (*Lamb,* at p. 452, quoting *People v. Mil* (2012) 53 Cal.4th 400, 418.)

### 2.  *Effect of Assembly Bill 333's Amendments*

Delvillar contends that the evidence was insufficient to meet Assembly Bill 333's heightened evidentiary requirements.  He specifically asserts that (1) the evidence failed to establish a pattern of criminal gang activity under Assembly Bill 333; (2) the prosecutor's reliance on the currently charged offense to prove the pattern of criminal gang activity constituted prejudicial error; and (3) the jury could have reached a contrary finding as to whether some of the predicate offenses were committed by active gang members. We address each contention below.

### a.  *Evidence Demonstrating a Pattern of Criminal Gang Activity*

We initially observe that two of the predicate offenses relied upon by the prosecutor in closing argument are no longer valid under current law.  First, with respect to Virgen's armed robbery on January 20, 2009, there is insufficient evidence showing that he committed the crime for the benefit of the gang.  As Delvillar observes, Virgen testified that he committed the crime for personal gain, rather than for the gang.

Second, as to the robbery committed by Guterriez; Flores's brother, Juan; and Spinella on March 19, 2010, Flores offered testimony describing the crime.  Over trial counsel's objection, Flores explained that proceeds from the robbery were remitted back to Ramirez and Cerpa, and that Juan committed the crime to put in work for the Norteño gang.

Flores also testified that his brother told him that proceeds from robberies happening in the same time period were going back to Cerpa's house.

The trial court should have sustained trial objection to this testimony. Flores was recounting statements made by his brother, a nontestifying witness, and those statements were offered for the truth of the matter asserted—to prove that the predicate offense was committed for the benefit of the Norteño gang. Excluding the details of the crime as described by Flores, who was not present during its commission, "a jury could have reasonably concluded that the predicate offense[] at issue [was] committed for personal gain alone." (*Lamb*, *supra*, 16 Cal.5th at p. 450 quoting *People v. Cooper* (2023) 14 Cal.5th 735, 744; see e.g. *Cooper*, at p. 746 [concluding that the jury could have reached a contrary finding as to whether the predicate offenses provided a common benefit to the gang that was more than reputational where the evidence established only that the gang members had committed a robbery and sale of narcotics].) We therefore do not consider these two predicates in our analysis of harmless error.

There was, however, evidence of other crimes committed by Norteño gang members that the jury could properly consider in evaluating the pattern of criminal gang activity. Although the prosecutor did not explicitly rely on these offenses as qualifying predicates during closing argument, the jury instructions did not limit the jury to the predicates specifically argued by the prosecution.[8] Thus, the jury was not foreclosed from relying on evidence of these other offenses in determining whether the pattern element was satisfied.

Rocha testified that on March 12, 2010, he participated in an armed robbery of Nino's Market in Turlock along with Daniel Flores, Juan Flores, and Sergio Gutierrez. Rocha stated that he committed the robbery at the direction of Montalvo, that he drove his accomplices to the robbery, and that Montalvo supplied the firearm Rocha used to

---

[8]     The jury instructions define "*A pattern of criminal gang activity*," to include: (1) The commission of: Two or more crimes of ROBBERY[.]"

accomplish the offense.  After the robbery, the group returned to the Keyes house with approximately $400 in proceeds.

Flores also admitted that on March 8, 2010, he robbed a taco truck in Delhi with fellow gang members Spinella and Gutierrez.  Flores stated that he committed the armed robbery at the direction of higher-ranking gang members, including Ramirez and Montalvo.  According to Flores, Montalvo instructed the group to return the proceeds, approximately $1,400, to the Keyes residence.  Although Flores admitted that he secretly kept $100 for himself, he nonetheless complied with Montalvo's directive to return the remaining proceeds.

These offenses closely tracked the organizational structure and criminal practices described by Detective Martin.  Martin testified that robberies were a primary activity of the Modesto-area Norteños and that such crimes were often committed at the direction of higher-ranking members.  Detective Martin explained that proceeds from robberies were used to support incarcerated Nuestra Familia members and to finance the gang's activities.

Testimony describing the March 8th and March 12th robberies was consistent with that explanation.  Both offenses involved active Norteño gang members acting collectively, at the direction of higher-ranking members of the gang, and returning proceeds to the Keyes house, which functioned as a hub for Norteño gang activity, and in one instance, using a firearm supplied by gang leadership.  Although Flores admitted to secretly retaining a portion of the proceeds for himself, that testimony does not negate the evidence that the robberies were ordered by higher-ranking gang members and intended to benefit the gang financially.  Indeed, based on the trial testimony, members of the gang commonly receive some portion of the proceeds from the crimes they committed for the gang.  Flores, for example, stated that he was given some of the proceeds from both robberies he committed for the gang.

Further, Detective Martin explained, members are expected to "put in work" for the gang.  Part of this expectation involves generating funds for the gang by committing crimes.

26.

Individual misconduct in secretly withholding proceeds would be viewed as cheating the gang, as Flores himself acknowledged. We therefore infer that such conduct would be viewed as a violation of gang expectations, rather than the absence of a gang-related objective.

Viewed in light of the expert testimony and the surrounding circumstances, these additional robberies provided evidence from which no rational juror could fail to find that the Norteño gang members collectively engaged in criminal activity that conferred a benefit to the gang beyond mere reputation. We therefore conclude that the instructional error here was harmless beyond a reasonable doubt.

### b. *Evidence Demonstrating that the Subjects of the Predicate Crimes Were Active Gang Members*

Delvillar further contends that the evidence was unclear as to what constitutes a gang member, emphasizing testimony suggesting that individuals often refer to themselves as "Northerners" without having been formally initiated into the gang. He relies on testimony from Flores, Becerra, and Detective Martin indicating that some individuals associate with the gang informally, that the distinction between "Northerner" and "Norteño" is not always well understood, and that formal initiation into the Norteño gang requires additional steps. From this, Delvillar contends that a jury could have harbored reasonable doubt as to whether the subjects of the predicate offenses were active gang members.

The argument misconstrues both the evidence and the governing legal standard. Section 186.22, as amended by Assembly Bill 333, does not require proof of formal membership, hierarchical status, or completion of a regiment initiation process. Nor does it require proof that an individual used a particular label to describe himself. The statute requires proof that the predicate offense was committed by a gang member, a determination that may be based on the totality of the evidence, including conduct, associations, self-identification, and participation in gang-directed criminal activity. Here, the same witnesses

Delvillar identifies also provided testimony supporting a finding of active gang membership under that standard.

Detective Martin testified that individuals who identify themselves as "Northerners" consider themselves part of the Norteño gang, and that Northerners function within the gang structure as developing or lower-level members. Flores offered similar testimony, explaining that Northerners are still part of the gang, they are just lower ranking members.

Flores and Becerra described a system in which individuals associate with the gang, commit crimes alongside admitted gang members, and operate under the direction of more established Norteño gang members. The fact that some individuals lack formal status, and the distinctions between Northerner and Norteño are imprecise, does not negate gang membership where the evidence shows participation in gang-directed robberies, association with admitted gang members, and conduct undertaken for the gang's benefit.

Viewed as a whole, the trial evidence did not present the jury with a binary choice between "formal Norteño" and "non-member." Rather, it described a continuum of gang involvement in which Northerners operate as part of the Norteño criminal street gang. On this record, a rational jury would not have concluded that individuals who committed armed robberies alongside admitted Norteño members, acted at the direction of gang leadership, and returned proceeds to the gang were not members of the gang merely because they were described as Northerners or had not completed a formal gang initiation. Accordingly, we conclude that the evidence does not support Delvillar's claim that the jury could have failed to find the gang-membership element proven beyond a reasonable doubt.

### c. The Jury's Reliance on Predicates Rendered Invalid by Assembly Bill 333

Finally, Delvillar submits that the jury's true findings on the gang allegations may have been based on predicate offenses that are no longer permissible under Assembly Bill 333. We are not persuaded that reversal of the gang enhancements is required on this basis.

As our Supreme Court explained, "[i]n cases where the instructional error at issue is a misdescription or omission of elements with no alternative theory presented, the prosecutor argued and the jury necessarily considered the invalid theory because it was the only one presented. Indeed, in such cases we can be sure the jury actually relied on the invalid theory, again because it was the only one presented to it." (*In re Lopez* (2023) 14 Cal.5th 562, 582, citing *Neder v. United States, supra,* 527 U.S. at p. 18.) But the court also made clear that this circumstance "does not categorically bar a reviewing court from finding the error harmless where any rational jury would have found the defendant guilty notwithstanding the error." (*Lopez*, at p. 582.) Consistent with that principle, "[n]o higher standard of review applies to alternative-theory error than applies to other misdescriptions of the elements." (*People v. Aledamat* (2019) 8 Cal.5th 1, 9.)

Applying that framework here, the question is whether a rational jury, properly instructed under Assembly Bill 333, could have failed to find the pattern-of-criminal-gang-activity element proven beyond a reasonable doubt. (*Lamb, supra,* 76 Cal.App.5th at pp. 1024–1026.) Although the predicates referenced by the prosecutor in closing argument are no longer valid predicates under Assembly Bill 333, the record contains strong evidence of other robberies committed by active and admitted gang members acting collectively, at the direction of higher-ranking figures, and for the gang's financial benefit. Those offenses independently satisfied Assembly Bill 333's heightened evidentiary requirements, including the requirement that predicate offenses provide a common benefit to the gang that was more than reputational. Accordingly, while the predicate offenses relied upon by the prosecutor in closing argument must be disregarded, their inclusion under the former instructions does not require reversal of the gang enhancements, as the instructional error was harmless beyond a reasonable doubt.

## DISPOSITION

The personal gun-use enhancements applied to count 2 and 3 of Delvillar's sentence are stricken, and the vicarious firearm use enhancements (§ 12022.53, subds. (d) & (e)(1))

are reinstated.  The matter is remanded back to the lower court for a full resentencing hearing.  At resentencing, the trial court is directed to either strike or impose the vicarious gun use enhancements, and to sentence Delvillar accordingly.

FRANSON, J.

WE CONCUR:

HILL, P. J.

LEVY, J.